# EXHIBIT B

Page 1

1 IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEBRASKA
2 LINCOLN DIVISION
3 CATHERINE PALMER,       ) CASE NO. 4:19-CV-3084
                         )
4         PLAINTIFF,     ) DEPOSITION OF
                         ) CATHERINE PALMER
5 VS.                    )
                         )
6 KCI USA, INC.,         )
                         )
7         DEFENDANT.     )
  --------------------------
8
9
10          DEPOSITION OF CATHERINE PALMER, taken
11 before Cynthia Craig, Registered Professional
12 Reporter and General Notary Public within and for
13 the State of Nebraska, beginning at 9:24 a.m., on
14 June 4, 2020, at the Community Room, O'Neill,
15 Nebraska, pursuant to the within stipulations.
16
17
18
19
20
21
22
23
24
25

```
 1   been arrested?
 2        A.   No.
 3        Q.   This lawsuit is brought pursuant to a
 4   federal statute called the Telephone Consumer
 5   Protection Act, the TCPA.  Are you familiar with
 6   that term?
 7        A.   Correct, yes.
 8        Q.   Have you made any other claims in the past
 9   unrelated to this one for phone calls related to the
10   TCPA?
11        A.   No.
12        Q.   Have you ever declared any type of
13   personal bankruptcy?
14        A.   No.
15        Q.   How about the ranch?
16        A.   No.
17        Q.   Other than talking to your lawyer, what
18   did you do to get ready for this deposition today?
19        A.   I read through the information that
20   Mr. Klinger had sent for me to read through.  I --
21   back when my printer was working, I had gone online
22   and printed out the invoices from the phone company
23   to see how many calls I had from KCI.  Talking to my
24   husband I guess because he knew how upset I was at
25   the time when it just would not quit.
```

Page 38

1           And have you talked to your husband about
2   this lawsuit at all?
3        A.   Some, not a lot.
4        Q.   And --
5        A.   He --
6        Q.   Go ahead, I'm sorry, I interrupted you.
7        A.   I guess I don't really have anything else
8   to say.
9        Q.   Okay.
10       A.   We have discussed it, but not a lot.
11  He -- he just isn't into stuff like that.
12       Q.   What do you mean by that?
13       A.   He knows I'm upset, but what I do about it
14  is my decision.
15       Q.   Okay.  Does he support your decision to
16  bring the lawsuit?
17       A.   Yes.
18       Q.   You told me also that your --
19            MR. ZALUD:  By the way, before I
20  forget, so, Gary, we'll send a letter, but I'd like
21  to get a copy of the invoices.
22            MR. KLINGER:  We'll get them over
23  ASAP.
24            MR. ZALUD:  Yeah, that Mrs. Palmer
25  referenced.

Page 40

1  Q. Other than the invoices we just talked
2  about, do you have any other documents relate -- and
3  I kind of already asked you this, but I want to make
4  sure, do you have any other documents related to the
5  calls that are at issue in this lawsuit?
6  A. I would have copies of the e-mails I made
7  to KCI to tell them again that they were calling my
8  number instead of this other woman's, and that I had
9  never owed them money, had never used any of their
10 products.
11     I checked with my landline to see -- it
12 was a toll-free number, so I called them back on
13 that rather than using time off my cell phone
14 because it's not unlimited totally, and, plus, we
15 don't have good coverage at home to -- so I would
16 use my landline to see how many calls I'd placed to
17 them.
18  Q. And I'm not sure I understand last thing
19 you just said.
20  A. I called the secretary for the landline
21 number, K & M Telephone, to see if she could tell me
22 how many calls I had placed to their 800 number.
23  Q. Okay. And I'm sorry, why did you do that?
24  A. Just to see how many times I'd called them
25 back.

Page 65

1    A.   They were until I cleaned up my computer
2  and everything disappeared.  And it's through Gmail,
3  I had a file with them, and that was pertaining to
4  this, and it wiped it out.  And my computer expert
5  guy told me that with Gmail there's no way to get
6  them back.
7    Q.   Do you think you could contact Viaero
8  today and -- I don't mean this exact day, but these
9  days, and ask them for those records, if they would
10 still have them?
11   A.   I would think so.
12   Q.   So Mrs. Palmer, this lawsuit is about
13 phone calls, right?
14   A.   Yes.
15   Q.   I want to ask you some questions about the
16 calls that are at issue I believe in this lawsuit.
17 Do you know -- and these are calls you believe you
18 received from KCI, correct?
19   A.   Yes.
20   Q.   That's what -- that'll be our
21 understanding when I ask you these questions, okay?
22   A.   Okay.
23   Q.   Do you know about how many there were?
24   A.   I would think nine or ten at least.
25   Q.   And what telephone number received these

Page 69

1  from which number?
2       A.   I probably could at the time.  I no longer
3  remember.
4       Q.   I'm sticking with the first call now, all
5  right?  Who answered that first call?
6       A.   It was a voice message -- or do you mean
7  when I called back.
8       Q.   No, no, when you received the call?
9       A.   I didn't answer it.  I didn't hear it
10 ring.  It was a voice mail, and it left -- it said
11 it was KCI.  I called it back and told them that
12 they had the wrong number, that I didn't know them,
13 I didn't know the lady they were asking for, I
14 didn't owe them any money, I didn't have any of
15 their products.
16      Q.   I'm gonna get to the voice mail message in
17 a second, but I just -- I think I'm clear, but I
18 want to make sure.
19           So even the first call, you didn't answer
20 that call.  You saw it in a voice mail, didn't
21 recognize it and listened to it?
22      A.   Yes.
23      Q.   And what was -- what is your recollection
24 of what was said on that call, the first call?
25      A.   That it was KCI, they were asking for a

Page 65

1  A. They were until I cleaned up my computer
2  and everything disappeared. And it's through Gmail,
3  I had a file with them, and that was pertaining to
4  this, and it wiped it out. And my computer expert
5  guy told me that with Gmail there's no way to get
6  them back.
7  Q. Do you think you could contact Viaero
8  today and -- I don't mean this exact day, but these
9  days, and ask them for those records, if they would
10 still have them?
11 A. I would think so.
12 Q. So Mrs. Palmer, this lawsuit is about
13 phone calls, right?
14 A. Yes.
15 Q. I want to ask you some questions about the
16 calls that are at issue I believe in this lawsuit.
17 Do you know -- and these are calls you believe you
18 received from KCI, correct?
19 A. Yes.
20 Q. That's what -- that'll be our
21 understanding when I ask you these questions, okay?
22 A. Okay.
23 Q. Do you know about how many there were?
24 A. I would think nine or ten at least.
25 Q. And what telephone number received these

Page 66

1  calls?
2      A.   My cell phone number, (402)336-7223.
3      Q.   Did you record in any way any of these
4  calls that you received?
5      A.   No.
6      Q.   And you mentioned -- if I already asked
7  you this, I'm sorry, but you mentioned that -- well,
8  hold on.  There were some calls that you -- you did
9  not answer that went into the -- went into voice
10 mail on a cell phone; is that accurate?
11     A.   Yes, the majority of them.  I'm not sure I
12 ever answered it ringing that I would find the voice
13 mail, and from the -- because I do not like to leave
14 things unfinished, I called back the number they
15 left immediately from my landline phone and told
16 them that they were -- I was not this person, I
17 didn't know who they were, I didn't owe them any
18 money, I had never used any of their equipment, and
19 could they take my number off the calling list, and
20 the lady said yes.
21          And then the next day or two I had another
22 call, so I called back again, and I said you're
23 still calling this number, I'm not that lady, and
24 can you take my number off the list, and she said I
25 can't do that.  And I said, you put it on there, you

Page 74

1  Q. Did you write that down at some point?
2  A. Yes.
3  Q. And that would probably be in some of the
4  paperwork that you disposed of?
5  A. Yes.
6  Q. So within a couple of days of the first
7  call, you get another call, right?
8  A. Yes.
9  Q. And so I'm clear, that was again a call
10 where it rolled directly into the iPhone's voice
11 mail?
12 A. Yes.
13 Q. And you heard some beeping, so you
14 listened to it?
15 A. Whether I heard the beeping then or I just
16 saw it on the message -- messages where it shows
17 what's transpired.
18 Q. By that, you mean you saw the phone number
19 or some phones have, like, a transcription of the --
20 A. It has, like, a tape recorder symbol that
21 shows that you have a voice mail.
22 Q. And then do you remember, did you listen
23 to that voice mail for the second call?
24 A. Yes, I listened to all of them.
25 Q. Okay. I want to stick with the second

Page 75

1  call if you can distinguish them, but the second
2  call, what was the message on the voice mail?
3       A.   It was the exact same message as the first
4  message, except a different woman's voice saying
5  that -- well, as you used the example Katie, this is
6  Katie.  The name was different.
7       Q.   And who was the caller on the second call?
8       A.   I don't remember their first names, but it
9  was KCI.
10       Q.   And from what number was the caller
11  calling for the second call?
12       A.   The same as the first.
13       Q.   And what the woman said on the call was
14  very similar to what had been said on the first
15  call?
16       A.   Almost verbatim.
17       Q.   So the second call then was received by
18  that 223 cell phone sometime in March or April of
19  2019 then, right?
20       A.   Correct.
21       Q.   Do you remember how long after that -- was
22  there another call after that, after the second
23  call?
24       A.   I received several calls for several
25  months from them.  They would -- it would be, like,

Page 76

1  two calls on the same day or on the subsequent day.
2  After the first one, I called back, told them they
3  had the wrong person, the wrong phone number.  I did
4  that several times.
5           I asked them to take my number off.  Like
6  I said, the one lady told me they couldn't, and then
7  finally after finding the Web site, I e-mailed them
8  and told them I thought maybe if they had a written
9  record, that that would work.
10      Q.   I --
11      A.   I felt harassed.
12      Q.   Pardon me?
13      A.   I felt harassed.
14      Q.   I might have already asked this, but how
15  did you find the Web site?  Was that when you were
16  in the --
17      A.   Viaero looked it up for me.
18      Q.   We already talked about that, Ms. Hurley
19  looked it up?
20      A.   Right.
21      Q.   Would it be accurate to say that the calls
22  received on cell phone ▇▇▇ that you meant that
23  we're talking about here, did they all say similar
24  things?
25      A.   Yes, very similar.

Page 81

1  understand you're just estimating, but started in
2  March or April of 2019?
3       A.   Yes.
4       Q.   And when did the -- when do you recall
5  that the calls ended?
6       A.   June.
7       Q.   Of 2019?
8       A.   Yes.
9       Q.   Did any of the calls ever threaten any
10 violence to you?
11      A.   To my bank account.  No, not to me
12 directly.
13      Q.   Any of the calls ever accuse you of a
14 crime?
15      A.   No.
16      Q.   Any of the calls threaten anything to you
17 in any way?
18      A.   No, not personally.
19      Q.   What do you mean by no, not personally?
20      A.   Well, I didn't feel they were going to
21 come after me right in my face, but it was very
22 disturbing to me to keep getting the calls and not
23 be able to stop them.  I was very upset.
24      Q.   Did you -- did you -- you mentioned
25 something about threatening your bank account.

Page 83

1       A.   William.
2       Q.   -- who gave you the iPhone?
3       A.   Yes.
4       Q.   And what did she have to say about it all?
5       A.   She just sympathized.  She said I don't
6  know what you can do.  You can call them back.
7       Q.   And what's her name?
8       A.   Gloria.
9       Q.   Gloria.  And last name?
10      A.   Stipes.
11      Q.   Stipes.  You said that you had called KCI
12 several times?
13      A.   Yes.
14      Q.   Tell me about the first time you called
15 KCI.
16      A.   I called them, told them I was not ▮▮▮▮▮
17 ▮▮▮▮▮  I didn't know ▮▮▮▮▮▮▮▮, I had none of
18 their equipment, I owe them no money and to please
19 take my -- to quit calling.  I think the second call
20 I told them to take my number off the list.
21      Q.   And the number that you called on those
22 calls, was it always the same number?
23      A.   Yes.
24      Q.   And I think you told me this before, I
25 want to make sure, that was the number you had heard

Page 84

1    in one or more of the recordings?
2         A.   Yes.
3         Q.   How many of the recordings?
4         A.   However many phone calls I received.
5         Q.   And what did they say back?  What did
6    the -- I want -- let's start with the first call you
7    made.  What did they say back to you on that call?
8         A.   She told me they would, and then I
9    received another call the next day, and she is the
10   lady then I said you put my number on this, you can
11   take it off, and she told me, no, they couldn't.
12        Q.   And did she explain why at all in that
13   conversation?
14        A.   If she said a reason why, I don't know.  I
15   just assumed she was a secretary and she didn't have
16   the authority, but I thought she would pass the
17   message on.
18        Q.   So that's two calls you made back.  Were
19   there others that you made back?
20        A.   Yes.
21        Q.   About how many?
22        A.   I would think five or six at least, and
23   plus numerous e-mails.
24        Q.   We'll look at all the e-mails in a minute.
25   I want to understand the calls.  You think maybe

Page 93

1  we do not know, and at that time you didn't -- that
2  was before the beauty shop encounter?
3       A.   Correct.
4       Q.   And what does it mean we do not know.  Who
5  is the we?
6       A.   My minor child and my myself, or my child
7  myself, my husband and myself, my whole family,
8  immediate family.
9       Q.   Then you say I've called your number
10 several times asking that this number be removed and
11 I'm getting nowhere.  You've kind of already
12 described that to me?
13      A.   Yes.
14      Q.   That's kind of a summary of what you told
15 me abut the calls you were making back to KCI,
16 right?
17      A.   Yes.
18      Q.   I will con- -- next I will contact the
19 authorities if this harassment doesn't end.  It
20 eventually ended, right?
21      A.   Yes, after the -- I think it was the
22 second e-mail because we'd received another call.
23      Q.   Which we'll go through.
24           And what do you mean by harassment?
25      A.   I felt harassed.  I'm a very honest

Page 94

1  person, I pay my bills.  When I call somebody and
2  tell them something, I expect to be believed.  I was
3  not believed.  They were wanting equipment I didn't
4  have.  They were wanting money I did not owe them.
5  I would ask them to take my number off, they
6  wouldn't do it.  It went on for months.
7      Q.   And you say we'll contact the authorities,
8  what, did you have some plans to contact some
9  authorities?
10     A.   Not at that point, but I thought maybe
11 that would be enough to make them realize that I was
12 serious.
13     Q.   Okay.  Let's keep going through the e-mail
14 string, all right?  And I think the response is on
15 Page 3.  Tell me when you're there.
16     A.   Yes.
17     Q.   And it looks like you get a response from
18 a guy named Joe Huerta, H-U-E-R-T-A, and it says
19 below his name, KCI, hyphen, KCI Express
20 representative, right?  Do you see that there?
21     A.   Yes.
22     Q.   And he responds to you that same day a
23 couple hours later, right?
24     A.   Yes.
25     Q.   He said, I apologize.  Hello, Cathy.  I

Page 113

1  of use of her cellular or telephone as the calls
2  came in, and the invasion of privacy and intrusion
3  upon her seclusion.
4           Do you see that?
5      A.   Yes.
6      Q.   So how much of your time was lost?
7      A.   The time it would take to that there was
8  another voice message, to listen to it, to go into
9  that ranch.  Usually I'm outside a lot, go into the
10 house and call from my landline, to my trip up here
11 to O'Neill to talk to Viaero to see what I was doing
12 wrong that I couldn't block the number, that the
13 calls still kept coming even though I had tried to
14 block it, the time on the phone with Mr. Klinger,
15 the various e-mails back and forth between us.  I
16 read everything at least twice to catch any possible
17 errors or clarify in my own mind.
18          Was that the question on time?
19     Q.   Yeah, uh-huh.
20     A.   Okay.  It was the main concern in my life
21 last year until my husband had the heart attack.  It
22 bothered me so much.
23     Q.   And the time you mentioned that you spent
24 with Mr. Klinger, that's all time that occurred
25 after you decided to bring the lawsuit, right?

Page 116

1  at the Viaero store, did you go anywhere else that
2  day downtown here?
3       A.   I don't remember, but I would assume I got
4  groceries anyway because I was here.
5       Q.   How about the little coffee shop down
6  there, did you go to that?
7       A.   It wasn't open then.
8       Q.   It looks pretty new.
9            The time you spent walking into the house
10 to pick up the landline and call KCI, and the time
11 you spent looking at your phone and listening to the
12 voice mails, what other things did that keep you
13 from doing?
14                 MR. KLINGER:  Object to the form.
15                 THE WITNESS:  Well, I would stop
16 whatever I was doing outside unless it was cattle
17 work because you just don't walk out on that, or if
18 I was in the hay field, I didn't leave the hay
19 field, but I was out in the yard raking the lawn or
20 in any garden, or if it came when I was in the
21 house, I would set down the cell phone, pick up the
22 other phone and call, and practically be shaking
23 because I could not believe that they could keep
24 doing this.
25            I guess if someone called me and said that

```
 1                C E R T I F I C A T E
 2
     STATE OF NEBRASKA    )
 3                        ) ss.
     COUNTY OF DOUGLAS    )
 4
 5        I, Cynthia Craig, Registered Professional
 6   Reporter and General Notary Public within and for
 7   the State of Nebraska, do hereby certify that the
 8   foregoing testimony of CATHERINE PALMER was taken by
 9   me in shorthand and thereafter reduced to
10   typewriting by use of Computer-Aided Transcription,
11   and the preceding one hundred twenty-nine (129)
12   pages contain a full, true and correct transcription
13   of all the testimony of said witness, to the best of
14   my ability;
15        That I am not a kin or in any way associated
16   with any of the parties to said cause of action, or
17   their counsel, and that I am not interested in the
18   event thereof.
19        IN WITNESS WHEREOF, I hereunto affix my
20   signature and seal the 16th day of June, 2020.
21
22                        _____
                          CYNTHIA A. CRAIG, RPR
23                        GENERAL NOTARY PUBLIC
24
25   My Commission Expires:
```

General Notary - State of Nebraska
CYNTHIA A. CRAIG
My Comm. Exp. Oct. 8, 2022.